UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
JERMAINE BRUNO,                                   :   __ Civ. __
                                                  :
                    Plaintiff,                    :   **COMPLAINT WITH JURY**
                                                  :   **DEMAND**
        -against-                                 :
                                                  :
ELEGANTE SERVICES INC., NEW ELEGANTE              :
CAR SERVICE, INC., RICARDO OQUENDO,               :
ANGELA PRATTS, and JOSE VILORIA,                  :
                                                  :
                    Defendants.                   :
------------------------------------------------------------------- X

Plaintiff, Jermaine Bruno, by his attorneys, Law Office of Andrea Paparella, PLLC, alleges as follows:

### NATURE OF THIS ACTION

1. Mr. Bruno brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); the Americans with Disabilities Act of 1990 ("ADA"); FMLA; the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. §§ 2601 et seq., ("FMLA"); the Fair Labor Standards Act ("FLSA"); the New York Labor Law ("NYLL"); the New York State Executive Law §§ 296 et seq. ("New York State Human Rights Law"); and the Administrative Code of the City of New York §§ 8-101 et seq. ("New York City Human Rights Law").

2. Mr. Bruno claims that Defendants Elegante Services Inc., New Elegante Car Service, Inc., Ricardo Oquendo, Angela Pratts, and Jose Viloria discriminated against him on the basis of his race and disability and retaliated against him for complaining of such discrimination.

3. Mr. Bruno further claims that Defendants paid him "off the books" and failed to pay him overtime premium pay.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

5. On August 26, 2016, Mr. Bruno filed a Charge of Discrimination with the Equal Opportunity Employment Commission (the "EEOC"), complaining that Elegante's conduct violated Title VII and the ADA, in addition to other laws.

6. The EEOC issued a Notice of Right to Sue, dated March 31, 2017, which is attached as Exhibit A.

7. Venue is appropriate in the Southern District of New York because, pursuant to 28 U.S.C. § 1391(b), a substantial part of the acts or omissions giving rise to the claims occurred in this District.

## THE PARTIES

8. Mr. Bruno is a 44-year-old African-American male.

9. Mr. Bruno worked for Elegante Services Inc. and New Elegante Car Services, Inc. d/b/a Elegante Transportation ("Elegante") from January 2013 to October 2014, and again from April 2015 to November 2015.

10. Throughout his employment with Elegante, Mr. Bruno was well-qualified for his position and performed his duties in a professional and competent manner.

11. Defendant Elegante Services Inc. ("Elegante Services") operates in New York State as a New York Domestic Business Corporation, where it was incorporated in February of 2012.

12. Elegante Services, at all relevant times, operate out of its base office at 1804 Randall Avenue, Bronx, New York 10473 and a nearby office 1904 Lacombe Avenue, Bronx New York.

13. Elegante Services offers non-emergency medical transportation ("N-EMT") to patients traveling to and from medical appointments who need extra assistance because of a medical condition. Elegante Services transports these patients in special-purpose vehicles equipped to carry wheelchairs or otherwise accommodate such disabled persons, which are staffed with two-men teams,

a driver and his helper. Elegante uses two types of vehicles to transport patients requiring such assistance, ambulettes and a "buggy." Ambulettes are specially-equipped vans that can carry two or three wheelchair patients, while a "buggy" is a car equipped to carry a single wheelchair patient, and much smaller.

14. Elegante Services also provides N-EMT to patients who do not need special assistance, such as shuttle services to and from nursing homes and rehab centers and private livery car services.

15. Elegante Services is a for-profit company, which receives most, if not all its income from insurance companies, which include both private insurers and government health care programs, such as Medicaid and Medicaid.

16. What would be Elegante Services began providing assisted N-EMT prior to its incorporation, in or before 2011, when it only serviced Brooklyn.

17. While Elegante Services assisted NEMT remains local, it now transports patients in its ambulettes and "buggy" within the borders of all five boroughs of New York City.

18. Defendant New Elegante Car Service, Inc. ("Elegante Car") is a New York Domestic Business Corporation, incorporated in New York State in May 1993.

19. Elegante Car is also based out of 1804 Randall Avenue, Bronx, New York 10473 and has offices at 1904 Lacombe Avenue in the Bronx, New York, where it operates with Elegante Services under the same d/b/a name "Elegante Transportation Services."

20. Elegante Car is a for-profit livery car service, which provides general ground transportation to passengers within all five boroughs of New York City, dispatching vehicles from Queens, Brooklyn and Manhattan along with those dispatched from the Bronx.

21. Defendant Jose "Vito" Viloria, a Dominican man, is, upon information and belief, a resident of the Bronx, New York. Mr. Viloria is the President of Operations of Elegante.

22. Mr. Vito works out of the Elegante's Bronx headquarters office and is the top on-the-scene executive managing Elegante's employees.

23. Defendant Angela Pratts, a Hispanic woman, is Mr. Viloria's spouse and, upon

3

information and belief, a resident of the Bronx, New York. Ms. Pratt is the Chief Executive Officer of Elegante.

24.     Defendant Ricardo Oquendo, a Puerto Rican man, upon information and belief, is a resident of the Bronx, New York.  Upon information and belief, Mr. Oquendo served as Elegante's Operations Manager throughout March 2011 to July 2015 and was the Operations Manager of Elegante Car in 2015.

25.     Mr. Oquendo too worked out of Elegante's Bronx headquarters, where he was the direct manager of all Elegante's employees. Mr. Oquendo was the most senior executive on the scene after Mr. Viloria.

## FACTS

**Defendants Were Mr. Bruno's Employers**

*Elegante Services And Elegante Car Are An Integrated, Single Employer*

26.     Elegante Services and Elegante Car are an integrated, single employer, both working under the d/b/a name Elegante Transportation ("Elegante").

27.     For example, Elegante Services and Elegante Car have interrelated operations, centralized control of labor relations, common management and common ownership or financial control.

28.     Indeed, their operations are centralized and headquartered at the same office in the Bronx and, upon information and belief, during the relevant time through today Ms. Pratts sits as the CEO and Mr. Viloria as the President of Operations of Elegante. In addition, during the relevant time, Mr. Oquendo served as upper management of Elegante, serving as the Manger of Operations.

*Elegante Services and Elegante Car Are Joint Employers*

29.     Elegante Services and Elegante Car are likewise joint employers.

30.     For instance, Elegante Services and Elegante Car share the same website, do business under the same name, and have overlapping upper management and executives who share supervisory

authority over both groups of Elegante.

31. Moreover, Elegante Services and Elegante Car share resources, including their headquarters office, main telephone number, and primary email address contact address.

32. Additionally, the executives at have the power to hire and fire employees in either group, determine pay and manage payroll, among other things.

### *Mr. Viloria, Ms. Pratts, And Mr. Oquendo Were Mr. Bruno's Employers Under The FLSA And The NYLL.*

33. Mr. Viloria, Ms. Pratts, and Mr. Oquendo were Mr. Bruno's "employers" for purposes of the FLSA and the NYLL as they were acting as such within the course and scope of the employer-employee relationship at all relevant times.

34. Mr. Viloria, Ms. Pratts, and Mr. Oquendo always exercised sufficient control of Elegante Services' operations to be covered employers pursuant to the FLSA and the NYLL.

35. Mr. Viloria, Ms. Pratts, and Mr. Oquendo directly managed Elegante's day-to-day operations.

36. Indeed, Mr. Viloria, Ms. Pratts, and Mr. Oquendo possessed the authority to hire and fire employees; implemented and supervised employees' work schedules; set employee pay rates; devised, directed, implemented and supervise Elegante's wage and hour practices affecting Elegante's employees, and were responsible for maintaining employee records, including payroll records.

37. At all relevant times, Mr. Viloria, Ms. Pratts, and Mr. Oquendo acted on Elegante's behalf and consented to, ratified, and authorized Elegante's acts alleged herein.

### **Overview Of Elegante's Ambulette Service**

38. The majority of Elegante's ambulettes had two people assigned to them: a driver and a helper. Drivers received the schedule of patients to pick up and transport. Drivers also received calls for unscheduled patients that requested an ambulette. The helper's job was to assist the driver in getting patients in and out of the ambulette.

39. Elegante had a main office where the administrative and managerial staff worked.

This included the managers and the dispatchers. Each manager oversaw different areas of the ambulette business. The dispatchers called the drivers and helpers and gave them assignments.

40. A two-man job was an assignment that required two men to carry a patient in and out of his or her home to the ambulette because of the client's weight or because their home had stairs.

41. Elegante told the drivers and helpers that its policy was not to assign two-man jobs if the patient lived above the third floor. However, Elegante constantly violated its own policy and assigned two-man jobs for patients that lived above the third floor.

**In January 2013, Mr. Bruno Began Working At Elegante As A Driver.**

42. In January 2013, Mr. Bruno began working at Elegante as a driver.

43. Elegante paid Mr. Bruno $10.00 an hour off the books. Mr. Bruno never received a raise while working at Elegante.

44. When Elegante hired Mr. Bruno, his schedule was supposed to be 7:00 a.m. to 3:00 p.m. but Mr. Bruno frequently worked overtime on his shifts and Saturdays when Mr. Bruno was not scheduled to work.

45. Elegante, however, did not pay Mr. Bruno any overtime pay.

46. Elegante also did not provide Mr. Bruno any breaks during his shift, including any breaks to use the restroom or eat lunch.

**Elegante Discriminated Against Its African-American Employees By Only Hiring Hispanic Employees To Work In The Office And Assigning Most Of The Two-Man Jobs To African-American Employees.**

47. Throughout Mr. Bruno's employment, Elegante gave its Hispanic employees preferential treatment while discriminating against its African-American employees.

48. Elegante's office staff was made up of entirely Hispanic employees. No African-American employees were allowed to work in the office.

49. Upon information and belief, Elegante fired African-American employees at a

higher rate than the Hispanic employees.

50. During Mr. Bruno's employment, for instance, there were a total of nine African-American employees, and Elegante fired three of those nine African-American employees.

51. Upon information and belief, Elegante primarily assigned the two-man jobs to the African-American drivers and helpers.

52. If a Hispanic driver or helper had a two-man job on his schedule, he could get his or her schedule changed and pass the assignment off to the African-American drivers and helpers.

53. If a Hispanic driver or helper received a call for a two-man job and complained, Elegante would accommodate the Hispanic driver or helper, and reassign the two-man job to an African-American driver or helper.

54. On the other hand, when Mr. Bruno complained about receiving a two-man job, Elegante often told Mr. Bruno to "just deal with it" and forced him to perform jobs that its Hispanic drivers and helpers would refuse to perform.

55. For example, Elegante forced Mr. Bruno to take assignments that the Hispanic drivers and helpers rejected that required carrying a client up and down five flights of stairs.

56. This pattern of assigning more work to the African-American drivers and helpers and giving them more of the two-man jobs continued throughout the duration of Mr. Bruno's employment.

**Elegante Also Discriminated Against Its African-American Employees By Refusing To Accommodate Their Schedules And Providing Better Quality Vans To Its Hispanic Employees.**

57. Elegante provided schedule accommodations to its Hispanic employees when they requested them; however, when Mr. Bruno and other African-American employees asked for schedule accommodations, Elegante frequently turned them down.

58. Elegante would also change Mr. Bruno's and other African-American employees' schedules without prior notice and would refuse to accommodate if they requested that Elegante adjust the new schedule.

7

59. Elegante also assigned more patients to its African-American employees than its Hispanic employees.

60. In addition, Elegante frequently gave its African-American employees poorer quality vans than those that the Hispanic employees used. For instance, Elegante frequently assigned its African-American employees vans with a broken heater in the winter or a broken air conditioner in the summer.

61. In contrast, Elegante assigned better quality vans to its Hispanic drivers and helpers.

62. Mr. Bruno complained in the summer of 2013, the winter of 2013, and the summer of 2015 about receiving broken vans. Each time Mr. Bruno complained, Elegante did not take any action to resolve the problem and simply told Mr. Bruno to deal with it.

63. Elegante had stationed a Hispanic employee in a lot where it kept the vans and assigned him to tend to the vans and assign them to drivers and helpers each day.

64. This Hispanic employee had all of the drivers' contact information, including Mr. Bruno's, so he could call them if a van that was assigned to a particular driver was not working. This way, the driver would not waste his or her time reporting to the station only to find out the van was not working.

65. Instead, on more than one occasion, the Hispanic employee intentionally waited until Mr. Bruno came to the lot only to have Mr. Bruno learn that his van was not working. The Hispanic employee then asked Mr. Bruno to wait for hours until the office called to say that there were no available vans for him, at which point Elegante allowed Mr. Bruno to go home.

66. Regardless of how long Mr. Bruno waited, Elegante only paid him for two hours.

67. By contrast, Mr. Bruno has seen a Hispanic driver arrive as Mr. Bruno was waiting for news of a van, get a new van if the van he was originally assigned wasn't working, and leave as Mr. Bruno was still waiting to hear about his van.

68. Elegante routinely reassigned working vans to Hispanic drivers when their vans did not work. When Elegante did not have any working vans available, Elegante would pay Hispanic drivers for pay worth four hours, regardless of whether they waited at the lot or not.

**Elegante's Hispanic Employees Frequently Made Racist and Racial Remarks About African-Americans And The African-American Employees.**

69. On one occasion Mr. Bruno was working alone without a helper when Ana Destrepo, Mr. Bruno's supervisor and a Hispanic female, assigned Mr. Bruno a two-man job.

70. When Mr. Bruno told Ms. Destrepo that he was working alone and could not do the two-man job, Ms. Destrepo said, "you better get your Black ass over there, you better do what is asked of you."

71. Mr. Bruno complained to Ms. Destrepo's supervisor, Rick, a Hispanic male, about her racist comment. Even though Rick was made aware of Ms. Destrepo's offensive, racist comment, Rick did not take any action.

72. Ms. Destrepo and the other office staff would talk disparagingly about African-Americans.

73. For example, they said, "I don't like these Black dirty…," "I don't like touching [African-Americans]," "I don't even like taking money from [African-Americans]."

**Elegante Paid Its Hispanic Employees More Than Its African-American Employees.**

74. At Elegante, drivers were supposed to get paid at a higher rate than helpers.

75. Upon information and belief, Elegante paid Hispanic helpers more than Mr. Bruno, even though Mr. Bruno was a driver.

76. During Mr. Bruno's employment, Hugo, a Hispanic helper, told Mr. Bruno that he was hired at $11.50 an hour. This was $1.50 higher than Mr. Bruno's hourly rate, and Mr. Bruno never received a raise.

**In May 2013 Mr. Bruno Was Injured On The Job.**

77. In May 2013, Elegante assigned Mr. Bruno to take a 350-pound client to his medical appointment and deliver him back to his apartment again.

78. Mr. Bruno called Elegante and asked the office to send another van as the job required another driver and helper.

79. Elegante, however, threatened to fire Mr. Bruno, saying that if Mr. Bruno did not do the job, he could look for a new job.

80. Because Elegante threatened to fire him, Mr. Bruno was forced to perform his assignment with only his helper to assist him.

81. While Mr. Bruno and his helper were carrying the client to bring him to the ambulette, they slipped and Mr. Bruno hurt his back. The helper also injured her leg.

82. Mr. Bruno's injury was serious. In fact, Mr. Bruno experienced such excruciating that he could not get back into the van.

83. Mr. Bruno then called Elegante to inform the office that he hurt myself and explain the extent of my injury.

84. Again, Elegante threatened to fire Mr. Bruno by saying that if Mr. Bruno did not drive the patient, he could look for a new job.

85. Mr. Bruno then called Jose Viloria, Elegante's President of Operations. Mr. Viloria repeated the threat to fire Mr. Bruno unless he performed his assignment.

86. Mr. Bruno had no choice but to get back into the van and drive the client to his appointment.

87. Throughout Mr. Bruno's employment, Elegante frequently threatened to fire Mr. Bruno if he did not comply with Elegante's assignments or instructions.

**In October 2014, Elegante Knowingly Assigned Work That Mr. Bruno Was Unable To Perform Due To His Injury, Then Constructively Terminated Mr. Bruno's Employment For Failing To Perform That Assignment.**

88. Since his workplace injury in May 2013, Mr. Bruno's back continued to hurt for the next 15 months.

89. In October 2014, Elegante assigned Mr. Bruno to carry another heavy patient, even though it knew Mr. Bruno had suffered an injury and was unable to perform such task.

90. When Mr. Bruno informed Elegante that he was unable to perform the assignment because of his injured back, Elegante told Mr. Bruno that if he did not take the assignment, it

10

would fire him.

91. As Mr. Bruno's injury inevitably left Mr. Bruno incapable for taking the assignment, Elegante constructively terminated Mr. Bruno's employment in October 2014 and Mr. Bruno was forced to leave his job.

**In April 2015, Mr. Bruno Returned To Work For Elegante.**

92. In April 2015, Mr. Bruno returned to work for Elegante, despite its discrimination and abuse against him, because it was a steady job and he needed to work.

93. When Mr. Bruno returned, however, Mr. Bruno noticed that the working conditions for African-American employees have worsened, including Elegante's treatment of them.

94. Elegante increased Mr. Bruno's work hours and Mr. Bruno now had to work from 5:30 a.m. to approximately 5:00 or 7:00 p.m.

95. In fact, Elegante also increased work hours for other African-American employees.

**In June 2015, Mr. Bruno Informed Elegante About Experiencing Back Pain But Elegante Did Not Give Mr. Bruno Any Sick Days Off As It Promised.**

96. In June 2015, Mr. Bruno's back pain returned so Mr. Bruno informed Elegante about his back pain.

97. Elegante said it would provide Mr. Bruno three days off to see a doctor.

98. However, Elegante did not give Mr. Bruno any days off to see a doctor.

99. In fact, Elegante only gave Mr. Bruno three days without any two-man jobs, which meant Mr. Bruno still had to report to work.

**In June 2015, Elegante Denied Mr. Bruno Paid Time Off To Attend A Funeral, But Later Allowed A Hispanic Employee To Take Paid Time Off To Attend A Funeral.**

100. In June 2015, Mr. Bruno had a family funeral to attend in South Carolina so he requested Elegante for paid time off to travel to and attend the funeral.

101. Elegante told Mr. Bruno that he had to wait until he was not scheduled to work,

11

which was Saturday and Sunday. This would have been too late for Mr. Bruno to attend the family funeral.

102. Because Elegante denied Mr. Bruno leave, Mr. Bruno was forced to take two personal days, which meant he would not receive pay for those two days.

103. Approximately a month later, in August 2015, Hugo, a Hispanic employee, had a family funeral in Puerto Rico.

104. Upon information and belief, Elegante allowed Hugo attend the family funeral and paid him half a day's salary for each day he took off.

**In October Or November 2015, Elegante Denied Mr. Bruno Permission To Leave Work Early, But Allowed Mr. Bruno's Hispanic Partner To Leave Work Early.**

105. In late October or early November 2015, Mr. Bruno had a special event to attend for his son at his school. The event started at 2 p.m., so Mr. Bruno asked Elegante if he could leave work early.

106. Elegante, however, did not allow Mr. Bruno to leave early.

107. In contrast, that same day, Mr. Bruno's partner, Neal, a Hispanic male, asked Ms. Destrepo if he could leave work early at 1:15 p.m. because he wasn't feeling well.

108. Even though this was before the end of Neal's shift, Ms. Destrepo permitted him to go home early.

109. This was typical of the double treatment for African-Americans employees at Elegante.

**On November 2, 2015, Elegante Terminated Mr. Bruno's Employment After Increasing Mr. Bruno's Shift Twice, While Keeping Most Of The Hispanic Employees' Schedules The Same.**

110. On November 2, 2015, when Mr. Bruno reported to work, Elegante informed him that he would now be working a 10-hour shift, from 7:00 a.m. to 5:00 p.m. Mr. Bruno's schedule had been from 7:00 a.m. to 3:00 p.m.

111. This new 10-hour shift would not allow Mr. Bruno to pick up his kids at 4:00 p.m.

112. When Mr. Bruno complained, Elegante did not care that he had to pick up his kids. Mr. Bruno's supervisors threatened to fire Mr. Bruno, saying that Mr. Bruno either had to take the new schedule or not come back to work.

113. Afraid to lose his job, Mr. Bruno reluctantly accepted the new schedule change. However, immediately after Mr. Bruno accepted it, Elegante changed Mr. Bruno's schedule again, making it a 12-hour shift.

114. When Mr. Bruno informed Elegante that he could not work that shift, Elegante terminated Mr. Bruno's employment.

115. Upon information and belief, Elegante's change in Mr. Bruno's schedule to 10 hours, and then again to 12 hours, was discriminatory and motivated by Mr. Bruno's race. Indeed, Elegante did not increase the Hispanic employees' shifts in a similar manner.

## FIRST CLAIM
### Race Discrimination And Retaliation In Violation Of Title VII
**(Against Elegante)**

116. Mr. Bruno repeats and realleges the allegations contained above as if separately set forth herein.

117. At all relevant times. Mr. Bruno was an "employee" of Elegante under Title VII, 42 U.S.C. § 2000e(f).

118. Elegante is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

119. By its actions described above, Elegante has unlawfully discriminated against Mr. Bruno on the basis of his race and retaliated against Mr. Bruno for complaining of such discrimination in violation of Title VII.

13

120. As a result of Elegante's discriminatory and retaliatory conduct, Mr. Bruno has suffered substantial damages, including emotional pain and mental anguish, in an amount to be determined at trial.

121. Upon information and belief, Elegante's discriminatory conduct was engaged with malice and/or reckless indifference to Mr. Bruno's rights. Mr. Bruno is therefore entitled to punitive damages under Title VII.

**SECOND CLAIM**
**Discrimination And Retaliation In Violation Of Section 1981**
**(Against Defendants)**

122. Mr. Bruno repeats and realleges the allegations contained above as if separately set forth herein.

123. By their actions detailed above, Defendants unlawfully discriminated against Mr. Bruno on the basis of his race and retaliated against him for complaining of such discrimination in violation of Section 1981.

124. As a result of the discrimination and retaliation described above, Mr. Bruno has suffered substantial loss of earning and benefits, and he will continue to do so in the future. Accordingly, Defendants are liable to Mr. Bruno for, among other things, back pay, front pay, damages for emotional distress, attorneys' fees and costs, interest, and punitive damages.

**THIRD CLAIM**
**Discrimination And Retaliation In Violation Of The ADA**
**(Against Defendants)**

125. Mr. Bruno repeats and realleges the allegations contained above as if separately set forth herein.

126. Defendants' failure to reasonably accommodate Mr. Bruno's disability constituted

unlawful intentional discrimination against Mr. Bruno in violation of the ADA, 42 U.S.C. § 12112(b)(5)(A).

127. As a result of Defendants' discriminatory and retaliatory conduct, Mr. Bruno has suffered substantial damages, including lost past and future wages, emotional pain and mental anguish, and attorneys' fees and costs in an amount to be determined at trial.

128. Upon information and belief, Defendants' discriminatory conduct was engaged with malice and/or reckless indifference to Mr. Bruno's rights under the ADA. Mr. Bruno is therefore entitled to punitive damages under the ADA.

## FOURTH CLAIM
### Retaliation And Interference In Violation Of The FMLA
**(Against Elegante)**

129. Mr. Bruno repeats and realleges the allegations contained above as if separately set forth herein.

130. By failing to accommodate Mr. Bruno's request for leave and the other actions described herein, Defendants violated the FMLA, 42 U.S.C. 2002e et seq.

131. Mr. Bruno suffered damages as a result of Elegante's unlawful retaliatory behavior and interference and is therefore entitled to back pay, front pay, post- and prejudgment interest, reinstatement and attorneys' fees and costs incurred in bringing this action, pursuant to the FMLA.

132. In addition, the FMLA entitles Mr. Bruno to liquidated damages.

## FIFTH CLAIM
### Violation Of The FLSA
**(Against Defendants)**

133. Mr. Bruno repeats and realleges the allegations contained above as if separately set forth herein.

134. Mr. Bruno is an employee and Defendants are employers under the FLSA, 29 U.S.C. § 203.

135. Defendants' policies and practice of suffering, permitting and demanding Mr. Bruno work long hours resulted in Mr. Bruno working substantial overtime, for which Defendants failed to pay him at the legally-required overtime premium pay of time and a-half the hourly rate of pay for all time worked exceeding 40 hours in a workweek. 29 U.S.C. § 207.

136. Due to Defendants' violation of the FLSA, Mr. Bruno is entitled to recover his unpaid overtime pay, owed pay, liquidated damages as provided by the FLSA for overtime violations, attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

137. Defendants' conduct described above also constitutes willful violation of the FLSA.

## SIXTH CLAIM
### Violation Of The NYLL
**(Against Defendants)**

138. Mr. Bruno repeats and realleges the allegations contained above as if separately set forth herein.

139. Defendants violated the NYLL by, among other things, paying Mr. Bruno "off the books" and retaining a substantial portion of Mr. Bruno's earned overtime pay.

140. Due to Defendants' NYLL violations, Mr. Bruno is entitled to recover, among other things, unpaid wages and overtime premium pay, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action.

## SEVENTH CLAIM
### Race And Disability Discrimination And Retaliation
### In Violation Of The New York State Human Rights Law
**(Against Elegante For Race and Disability Discrimination And Retaliation And Against Mr. Viloria, Ms. Pratts, And Mr. Oquendo For Aiding And Abetting)**

141. Mr. Bruno repeats and realleges the allegations contained above as if separately set forth herein.

142.  By its actions detailed above, Elegante unlawfully discriminated against Mr. Bruno on the basis of his race and disability and retaliated against Mr. Bruno for complaining of such discrimination in violation of the New York State Human Rights Law.

143.  Mr. Viloria's, Ms. Pratts's, and Mr. Oquendo's actions set forth above also violated § 296(6), which sets forth that:

> It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.

144.  Upon information and belief, Defendants' conduct towards Mr. Bruno constitutes willful discrimination.

145.  As a result of the willful discrimination and retaliation described above, Mr. Bruno has suffered substantial loss of earnings and benefits and will continue to do so in the future. Accordingly, Defendants are liable to Mr. Bruno for both back pay and reinstatement or front pay in lieu of reinstatement in an amount to be determined at trial, mental and emotional anguish, plus interest and costs.

### EIGHTH CLAIM
### Race And Disability Discrimination
### In Violation Of The New York City Human Rights Law
### (Against Defendants)

146.  Mr. Bruno repeats and realleges the allegations contained above as if separately set forth herein.

147.  Mr. Bruno is a "person" under the New York City Human Rights Law, § 8-102(1).

148.  Defendants are an "employer or an employee or agent thereof" under the New York City Human Rights Law, § 8-102(5) and § 8-107(1)(a).

149.  By their actions detailed above, Defendants have unlawfully discriminated against Mr. Bruno on the basis of race and disability and retaliation in violation of the New York City Human Rights Law.

150. In addition, Mr. Bruno opposed Defendants' unlawful, discriminatory employment practices and engaged in protected activity under the New York City Human Rights Law. In response, Defendants retaliated against Mr. Bruno for having engaged in protected activity.

151. As a result of Defendants' unlawful conduct, Mr. Bruno has suffered and continues to suffer substantial damages. Accordingly, Defendants are liable to Mr. Bruno for back pay and reinstatement or front pay in lieu of reinstatement, other employment benefits, and damages for emotional pain, attorneys' fees and costs, and mental anguish in amounts to be determined at trial.

152. Defendants' discriminatory conduct was taken with reckless indifference to Mr. Bruno's rights, entitling her to punitive damages under the New York City Human Rights Law.

### NINTH CLAIM
### Aiding And Abetting In Violation Of
### The New York City Human Rights Law
### (Against Defendants)

153. Mr. Bruno repeats and realleges the allegations contained above as if separately set forth herein.

154. Defendants' actions set forth above violated § 8-107(6), which sets forth that:

> It shall be unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court:

A. Accept jurisdiction over this matter;

B. Award Plaintiff unpaid wages and an equal amount in liquidated damages as provide for by the FLSA, 29 U.S.C. §§ 201, et seq.

C. Award Plaintiff unpaid wages and an equal amount in liquidated damages as provided for by the NYLL;

D. Issue an injunction requiring Defendants to pay all statutorily-required wages;

E. Order Defendants to compensate Plaintiff for his past and future lost wages and benefits;

F. Enter a judgment in favor of Plaintiff for such amount as may be awarded by a jury for compensatory damages, including, without limitation, for his physical and emotional suffering;

G. Enter a judgment in favor of Plaintiff for such amount as may be awarded by a jury for punitive damages;

H. Enter a judgment awarding Plaintiff all costs and reasonable attorneys' fees;

I. Enter a judgment awarding Plaintiff all pre- and post-judgment interest;

J. Enjoin Defendants from engaging in unlawful discriminatory practices; and

K. Grant such other further legal and equitable relief as this Court deems just and proper.

Dated: New York, New York
　　　　July 5, 2017

　　　　　　　　　　　　　　　　　　　Law Office of Andrea Paparella, PLLC

　　　　　　　　　　　　　　　　　By:　  /s/ Andrea M. Paparella
　　　　　　　　　　　　　　　　　　　Andrea M. Paparella
　　　　　　　　　　　　　　　　　　　Siobhan Klassen
　　　　　　　　　　　　　　　　　　　150 W. 28th Street, Suite 1603
　　　　　　　　　　　　　　　　　　　New York, New York 10001
　　　　　　　　　　　　　　　　　　　Telephone: (212) 675-2523
　　　　　　　　　　　　　　　　　　　Facsimile: (914) 462-3287
　　　　　　　　　　　　　　　　　　　Email: ap@andreapaparella.com
　　　　　　　　　　　　　　　　　　　　　　  sk@andreapaparella.com

　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*